**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SHIRLEY L. GRIEGO,

Plaintiff,

v. CV 14-446 WPL

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

Defendant.

**MEMORANDUM OPINION AND ORDER**

Shirley Griego applied for Disability Insurance Benefits and Supplemental Security Income on April 1, 2011, based on degenerative joint disease of the lumbar spine and depression. (Administrative Record ("AR") 57, 61, 67.) After her applications were denied at all administrative levels, she brought this proceeding for judicial review. The case is before me now on Griego's Motion to Reverse or Remand for Rehearing and a response filed by the Commissioner of the Social Security Administration ("SSA"). (Docs. 19, 22.) For the reasons explained below, I grant Griego's motion and remand this case to the SSA for proceedings consistent with this opinion.

**STANDARD OF REVIEW**

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall*

*v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse or remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

**SEQUENTIAL EVALUATION PROCESS**

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ then determines the physical and mental demands of the claimant's past relevant work in phase two of the fourth step and, in the third phase, compares the claimant's RFC with the functional requirements of her past relevant work to see if the claimant is still capable of performing her past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is

not prevented from performing her past work, then she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to her past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Griego is a forty-three-year-old woman with a high school education. (AR 169.) She worked as a cashier in various retail stores from 1990-1999, a hopper-filler and drink server at a casino from 1998-2000, an educational assistant in an elementary school from 1999 to 2005, and a receptionist at a dental office from 2008-2011. (AR 35, 170, 184.) Griego alleges disability beginning on March 7, 2011. (AR 61.) Because Griego argues that the ALJ erred by failing to consider the medically determinable impairments of anxiety and depression during his RFC assessment, I focus my discussion on these issues and records.

Griego was seen by John Franklin, M.D., on November 2, 2010, for depression. (AR 276.) She reported having no energy or motivation, frequently becoming tearful, experiencing problems at home, and often missing work. (*Id.*) Dr. Franklin noted that Griego was tearful, had a depressed affect, and avoided eye contact. (AR 277.) Dr. Franklin assessed Griego with major depression, recurrent, in an active episode. (*Id.*) He referred Griego to psychotherapy and prescribed Lexapro. (*Id.*) Griego returned to Dr. Franklin on November 16, 2010, for a follow-up

visit. (AR 273.) Dr. Franklin wrote that Griego was "[o]ff work per [his] orders." (*Id.*) Griego reported that she wanted to sleep all the time, felt depressed, and had a decreased appetite. (*Id.*) Dr. Franklin described her as quiet, with a flat affect and poor eye contact. (AR 274.) On November 30, 2010, Griego told Dr. Franklin that she was feeling better and "psyching herself out." (AR 270.) She had been taking Cymbalta for her depression, but reported being unable to tolerate it after one week because it made her nauseous and too sweaty. (*Id.*) Griego indicated that she could not afford counseling. (*Id.*) Dr. Franklin again assessed Griego with major depression, recurrent. (AR 271.)

The next record comes from Dr. Franklin's office on March 1, 2011. Griego reported that she fell on the floor and injured her tailbone five days before the visit. (AR 267.) On March 15, 2011, Dr. Franklin listed Griego's active problems as chronic lower back pain, lumbar spondylosis, spondylolisthesis, and major depression, recurrent. (AR 261.) Her medications included diazepam, Endocet, and ibuprofen. (*Id.*) Griego reported no numbness, tingling, or weakness, and was in no acute distress. (AR 262.)

A. Gallegos, an SSA employee, filled out a disability report on Griego on April 1, 2011. (AR 165-67.) Gallegos wrote that Griego exhibited difficulty breathing, concentrating, sitting, standing, walking, and seeing. (AR 166.) Griego was hyperventilating, anxious, and nervous; appeared to have a hard time focusing due to pain; could go no more than 8-10 minutes without having to change positions; and was well-groomed and pleasant, but cried through the whole interview. (AR 165-66.)

Griego saw Kari Thomas, P.A., on April 28, 2011, for low back, bilateral hip, and leg pain. (AR 315.) Thomas listed Griego's active problems as lower back pain, lumbar spondylosis, spondylolisthesis, and major depression, recurrent, with current medications of cyclobenzaprine,

Endocet, and ibuprofen. (*Id.*) Griego stated that she was unable to work and experienced sleep disturbances, fatigue, anxiety, depression, excessive thirst, and hair loss. (AR 316.)

Samuel Pallin, M.D., a non-examining consultant, conducted a physical RFC assessment of Griego on April 29, 2011. (AR 290-97.) Dr. Pallin assessed a primary diagnosis of degenerative joint disease of the lumbar spine. (AR 290.) Dr. Pallin determined that Griego could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and engage in pushing and pulling without limitation. (AR 291.) Dr. Pallin further determined that Griego had no additional physical limitations. (AR 292-94.) Dr. Pallin wrote that Griego's "[symptoms] greatly exceed those expected given the available objective evidence[,]" and that "[psychological] issues such as depression are beyond the scope of this assessment but may very well contribute to [Griego's symptoms]." (AR 294, 297.)

Elizabeth Chiang, M.D., a non-examining consultant, conducted a psychiatric review of Griego on May 2, 2011. (AR 298-310.) Dr. Chiang found that Griego had the medically determinable impairment of depressive disorder, not otherwise specified, that did not precisely satisfy the diagnostic criteria of the Listing 12.04 affective disorders. (AR 298, 301.) Dr. Chiang determined that Griego did not have any severe psychological impairment, had no functional limitations, and experienced no episodes of decompensation. (AR 298, 308.)

On May 18, 2011, Griego returned to Dr. Franklin for a follow up on her leg pain, and reported that her knees were hurting, with pain radiating down to her toes. (AR 324.) Griego indicated that she was still unemployed and "[felt] depression coming back." (AR 325.) Dr. Franklin wrote that he would keep track of Griego's depression symptoms and that her symptoms appeared to be aggravated by pain. (AR 326.)

On June 8, 2011, Griego reported to Dr. Franklin that her back pain worsened after she received L5-S1 steroid facet injections. (AR 321.) Griego indicated that all of her activities and abilities were weaker because of her pain, and Dr. Franklin noted that she was tearful from the pain and exhibited limited ability to function. (*Id.*) Dr. Franklin sent Griego to the pain clinic for pain management because she expressed reluctance to have back surgery. (AR 322.)

In a disability report dated June 8, 2011, Griego indicated that there had been no change in her conditions. (AR 204.) She wrote that "caring for [her] personal needs is extremely difficult," especially showering. (AR 207.) On June 20, 2011, Pola Garcia, Griego's mother, filled out a third-party function report. (AR 213-20.) Garcia wrote that Griego is unable to move much and spends most of her time in bed or trying to sit up (AR 214), and that she experiences limitations to all abilities because of her February 2011 injury (AR 218).

On June 29, 2011, Griego checked into the emergency room at Lovelace Women's Hospital, complaining of weakness, syncope, and vomiting. (AR 332-45.) Griego reported periodic lightheadedness and dizziness, feeling weak, and a syncopal episode the previous day. (AR 334.) James West, M.D., diagnosed Griego with pelvic pain, hyperventilation syndrome, and an anxiety reaction (AR 335); he prescribed Xanax (AR 337). Dr. West noted that Griego had a history of mild chronic depression, but no instances of outpatient counseling or psychiatric intervention. (AR 335.)

On July 12, 2011, Griego returned to Dr. Franklin for a follow-up visit after an anxiety attack. (AR 349.) Griego reported experiencing anxiety attacks once or twice per day, and said she was "stressed out" because of her daughter and her chronic back pain. (AR 350.) Dr. Franklin observed that Griego was tearful, but not in any acute distress. (AR 351.) He assessed Griego with lower back pain, lumbar spondylosis, a stye near her eye, spondylolisthesis, active

anxiety symptoms, and active major depression of the recurrent type. (*Id.*) Dr. Franklin determined that Griego's depression was co-morbid with her anxiety attacks and prescribed Zoloft. (*Id.*) He wrote that Griego "need[ed] to see [a] psychotherapist/[counselor]." (*Id.*)

Cathy Simutis, Ph.D., conducted a consultative psychological evaluation on Griego on August 16, 2011. (AR 357-59.) Dr. Simutis indicated that Griego appeared to be in severe pain and tried to control her pain and anxiety with breathing; exhibited difficulty walking, standing, and sitting; stood up twice during the interview and had visible tremors; was agitated but cooperative; and cried/sobbed during the interview, but her rate and tone of speech were within normal limits. (AR 358.) Dr. Simutis assessed Griego with major depressive disorder, severe; generalized anxiety disorder with panic attacks; and chronic pain due to a medical condition. (*Id.*) Dr. Simutis assessed Griego with a current GAF score of 35.[1] (AR 359.) Dr. Simutis found that Griego's ability to understand and remember instructions appeared markedly limited; her ability to concentrate and persist in a task appeared markedly limited; her ability to interact with coworkers and the public appeared moderately limited; and she exhibited no limitations in her ability to adapt to change. (*Id.*)

Griego returned to Thomas on November 8, 2011, for a follow-up visit for low back pain. (AR 368.) Griego was taking sertraline for anxiety and major depression, diazepam, Endocet, and ibuprofen. (AR 367.) Thomas noted that Griego's primary care physician, Dr. Franklin, had been handling her pain management, but she failed a urine toxicology screening and tested positive for marijuana, at which point the primary care physician refused to provide further pain

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between thirty-one and forty is assessed when the patient is believed to have "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Griego's mental health providers used this scoring method.

medication. (AR 368.) Thomas prescribed oxycodone and advised Griego that back surgery may be her only option going forward. (AR 369.)

Griego established a treating relationship with Judith Salleh, M.D., on December 9, 2011. (AR 393-400.) Griego complained of back pain, and Dr. Salleh diagnosed her with back pain, spondylolisthesis, episodic cannabis abuse, and major depressive disorder in a recurrent episode. (AR 393.) Griego was discharged from Dr. Salleh's care after Griego tested positive for marijuana on December 14, 2011. (AR 388.)

Griego established care with Gregory Maroney, P.A., on March 2, 2012. (AR 423-32.) Maroney assessed Griego with chronic back pain and a lumbosacral sprain. (AR 423.) Griego returned to Maroney on April 2, 2012, complaining of back pain that radiated down her left leg. (AR 418.) Griego signed another controlled substances contract and stated that she "feels good" three or four days a week. (AR 421.)

Griego then established care with Leena Cherukuri, M.D., on March 9, 2012. (AR 406-16.) Dr. Cherukuri diagnosed Griego with adjustment disorder with mixed anxiety and depressed mood, lumbago, chronic back pain, and a lumbosacral sprain. (AR 407.) Dr. Cherukuri noted that Griego exhibited a dysphoric mood with decreased concentration, and was nervous/anxious. (AR 414.)

## HEARING TESTIMONY

The ALJ held a hearing on August 23, 2012, at which Griego and a Vocational Expert ("VE") testified. (AR 29-56.) Griego was represented by an attorney. (*Id.*)

Griego testified that she lived with her son and was not employed. (AR 31-32.) Griego said that she received a GED and attended about three semesters of community college. (AR 41.) Her last job was working as a dental receptionist from 2008 through March 2011. (AR 32.)

Griego said that she injured her back when she tried to sit down at work, missed her chair, and fell, but that she had back problems prior to that. (*Id.*) Griego stood up during the middle of her testimony, and explained that she stood because her back was hurting. (AR 33.) Griego stated that, on a typical day, she does "[a] lot of nothing." (*Id.*)

Griego testified that she never filed a worker's compensation claim because the injury did not occur at work. (AR 34.) She said that she tried to return to work for about a week after her injury, but she was in so much pain that she went home for the day without permission and was fired. (*Id.*) Griego further stated that she did not subsequently file for unemployment because she was still receiving medical treatment and was therefore not eligible for unemployment benefits. (AR 35.) The ALJ then discussed Griego's work history with her. (AR 35-37.) As an educational assistant, Griego testified that she prepared homework and did one-on-one work with the students, as well as recess supervision. (AR 36.) Her position at the casino was full-time. (*Id.*)

Griego stated that on the day she signed a narcotics contract with Dr. Franklin, she "just signed it and . . . didn't really read it through." (AR 37.) Griego said she did not have a prescription for marijuana and could not afford to apply for a medical marijuana card. (*Id.*) Griego admitted that she still occasionally uses marijuana. (*Id.*)

Griego then said that she had attended physical therapy, but it made her feel worse and she would leave her sessions in tears. (AR 38.) Griego stated that she was not dismissed from physical therapy because of no-shows or cancellations. (*Id.*) The ALJ read a portion of the physical therapy discharge note aloud, and Griego indicated that the statements were incorrect. (*Id.*) Griego further contended that she attended every appointment in hopes of receiving some relief. (AR 39.) She also received injections in her back that were not helpful. (*Id.*) Griego testified that she had discussed surgical options with her doctors, but was informed that she

would still need to be careful with her back and take pain medication, and therefore she did not feel that surgery would be worth it. (*Id.*) Griego said that she continued experiencing pain radiating down her legs. (AR 42.)

Griego testified that she still suffered from depression and would get very upset. (AR 39.) Griego said that she gets frustrated because she could no longer provide for her children as she had in the past. (AR 39-40.) Griego stated that she had been taking sertralines that calmed her down, but she did not like the way the medications made her feel. (AR 40.) Griego said that she had discussed the side effects with Maroney. (*Id.*) Before being placed on sertralines, Griego had been taking Zoloft, and that was effective for her. (*Id.*) Griego said that she did not know why her medication was changed from Zoloft to sertralines, but that she was not taking any medication for depression at the time of the hearing. (AR 41.)

Griego testified that the pain in her back is very sharp, and "it feels like somebody's got [her] from the side of [her] hips and [is] just pulling [her] down." (AR 43.) She said that she has difficulty changing from any position. (*Id.*) Griego stated that she can sit or stand for approximately ten minutes before becoming uncomfortable and needing to move, or could walk approximately half a block, and that lying down is not comfortable. (AR 43-44.) Griego confirmed that she had issues with depression before her injury, but that her depression has worsened since she fell. (AR 44.)

The ALJ then questioned the VE. (AR 45-52.) The VE asked for clarification on Griego's job at the casino as a hopper-filler. (AR 46.) Griego informed the VE that she served non-alcoholic drinks and carried large sacks full of coins to refill slot machines. (AR 47.) The VE then classified Griego's past work as a dental receptionist as sedentary work, semi-skilled, with a Specific Vocational Preparation ("SVP") of 4. (AR 49.) The position as a drink server was light

work, unskilled, with an SVP of 2 because Griego did not serve food. (*Id.*) The VE classified Griego's work as an educational assistant as a "teacher aide II," which is light work, semi-skilled, with an SVP of 3. (*Id.*) For Griego's cashiering experience, the VE classified one job as a general cashier, light work, unskilled, with an SVP of 2, and the other as a cashier in a larger operation, light work, semi-skilled, with an SVP of 3. (AR 49-50.) The VE classified Griego's work as a hopper-filler as a "coin counter and wrapper," medium work, semi-skilled, with an SVP of 3. (AR 54.)

The ALJ then asked whether a person of Griego's age, education, and work history, limited to sedentary work, except that the person would occasionally climb ramps or stairs; could never climb ladders, ropes, or scaffolds; and could occasionally balance, stoop, kneel, crouch, or crawl; could perform any of Griego's past work. (AR 50.) The VE testified that such a person could work as a dental receptionist. (*Id.*)

The ALJ confirmed his understanding that individuals who are unable to maintain concentration, persistence, and pace for up to two hours at a time, with normal breaks throughout the day, are unable to work; the VE agreed. (*Id.*) The VE testified that an employer would typically allow one absence per month. (AR 51.)

Griego's attorney briefly questioned the VE. (AR 51.) The VE testified that a dental receptionist would not be able to change between sitting and standing on an at-will basis, as the job is typically performed. (AR 51-52.)

**THE ALJ AND APPEALS COUNCIL'S DECISIONS**

The ALJ reviewed Griego's application according to the five-step sequential evaluation process. (AR 14-21.) At the first step, the ALJ found that Griego had not engaged in substantial gainful activity since March 7, 2011, the alleged onset date. (AR 16.) Then, at the second step,

the ALJ concluded that Griego suffers from the severe impairment of lumbar spinal disease. (*Id.*) The ALJ determined that the medically determinable mental impairments of anxiety and depression, singly or in combination, do not qualify as severe impairments. (AR 17.) At step three, the ALJ found that Griego's severe impairment did not equal one of the listed impairments. (AR 18.)

At phase one of step four, the ALJ determined Griego's RFC, finding that Griego can perform sedentary work, except that she can occasionally climb ramps or stairs, cannot climb ropes or scaffolds, and can occasionally balance, stoop, crouch, and crawl. (AR 18.)

The ALJ summarized Griego's testimony and the AR. (AR 19-21.) The ALJ found that Griego's medically determinable impairments could be expected to produce her alleged symptoms, but found her not fully credible as to the intensity, persistence, and limiting effects of those symptoms. (AR 19.) He noted that Griego testified that she never missed physical therapy sessions, but evidence in the AR indicated that she frequently canceled, rescheduled, or did not appear for appointments. (*Id.*) The ALJ gave more weight to the medical records than to Griego's testimony on this point. (*Id.*) Griego testified that she experiences severe, radiating leg pain, but the ALJ found that her medical records referenced only a "tingling sensation in the legs [that] was not consistent with [a] diagnosis of radiculopathy," and the ALJ therefore concluded that Griego exaggerated her symptoms. (*Id.*) The ALJ further noted that Griego was discharged from treatment by two providers after she tested positive for marijuana use, despite signing a contract to not use illegal drugs. (*Id.*) He was not persuaded by Griego's testimony that she did not read the substance abuse contracts and found that her attempt to avoid the responsibility for her agreements diminished her overall credibility. (*Id.*) The ALJ further questioned Griego's

credibility based on findings of positive Waddell signs, by Brent Bevard, D.O., which are indicative of symptom magnification. (AR 20.)

The ALJ then summarized the third-party function report from Griego's mother. (*Id.*) He found that the activities described suggest that Griego could still work and gave the opinion statements partial weight. (*Id.*)

The ALJ found that the radiological evidence is consistent with grade 1 anterolisthesis at L5-S1 and bilateral spondylosis at L5. However, he accorded little weight to Dr. Franklin's opinion that Griego is unable to work because Dr. Franklin did not specify a duration for Griego's inability to work or provide a function-by-function analysis. (*Id.*)

The ALJ made no explicit findings at phase two of step four. At phase three, the ALJ found that Griego is capable of performing her past relevant work as a dental receptionist, based on her RFC and the physical and mental demands of that job as it is actually performed. (AR 21.) Because he found that Griego is capable of performing her past relevant work, the ALJ found that Griego is not disabled. (*Id.*)

Griego appealed the decision to the Appeals Council, but the Council found that Griego's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 5-8.)

## DISCUSSION

Griego makes several arguments for reversing and remanding this case. I have reordered the arguments to accord with the five-step sequential evaluation process. Griego first argues that the ALJ erred at step two by failing to find that Griego's depression constituted a severe impairment. Griego then argues that the ALJ erred at phase one of step four by failing to consider the effect of depression and anxiety on her RFC. Griego further argues that the ALJ

failed to properly consider Dr. Franklin's opinion as a treating physician at the RFC stage, in violation of Social Security Ruling ("SSR") 96-2p, 1996 WL 374188 (July 2, 1996), and SSR 96-5p, 1996 WL 374183 (July 2, 1996).[2] Next, Griego argues that the ALJ erred at phase two of step four by failing to make findings as to the mental and physical demands of Griego's past relevant work. Finally, Griego argues generally that the decision is not supported by substantial evidence.

## I. Step Two Findings

Griego argues that the ALJ erred by finding that she did not have any severe mental impairments. "[A]ny error [at step two is] harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence." *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *see also Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) ("We can easily dispose of . . . arguments[] which relate to the severity of [claimant's] impairments. The ALJ . . . made an explicit finding that [claimant] suffered from severe impairments. That was all the ALJ was required to do in that regard. [Claimant]'s real complaint is with how the ALJ ruled at [a later step].").

In this case, the ALJ found the severe impairment of lumbar spinal disease, and considered Griego's mental impairments to be non-severe. (AR 16-18.) The ALJ did not make a finding of non-disability at step two. As such, I find that even if the ALJ erred in failing to find that Griego had additional severe impairments, such an error would be harmless because the ALJ continued through the sequential evaluation process.

[2] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

**II. Step Four Findings**

"[I]n assessing the claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, *whether severe or not severe*." *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (emphasis in original) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)). An ALJ may not rely on his finding of non-severity instead of conducting a proper RFC analysis. *Id.* (citing SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996)).

Griego challenges the ALJ's RFC assessment on the grounds that he failed to include the determinable impairments of anxiety and depression. The ALJ determined at step two that these impairments were not severe (AR 17), but failed to discuss them during his RFC assessment (AR 18-21). In fact, during the ALJ's RFC analysis, he never mentioned Griego's medically determinable mental impairments or discussed Dr. Simutis's evaluation. (*Id.*)

The ALJ noted, at step two, that he accorded "little weight" to Dr. Simutis's evaluation because Dr. Simutis relied on Griego's "unreliable reporting" in making her evaluation. (AR 17.) Nowhere in the ALJ's opinion does he discuss Griego's history of anti-depressant or anti-anxiety medications (AR 261, 270, 273, 312, 337, 351, 367, 394, 403-04), or the multiple notations from treating sources about Griego's depression (AR 261-62, 270-71, 273-74, 276, 315-16, 325-26, 335-37, 349-51, 367, 394, 403-04, 407, 421).

Under the regulations and Tenth Circuit precedent, the ALJ is required to consider, analyze, and thoroughly discuss the combined effects of all medically determinable impairments when conducting an RFC assessment. The ALJ in this case expounded upon Griego's severe impairment of lumbar spinal disease and his assessment of Griego's credibility, but failed to

discuss the medically determinable impairments of anxiety and depression. This failure could materially impact the disability determination in this case and constitutes reversible error.

Griego also argues that the ALJ erred in his evaluation of Dr. Franklin's opinion as a treating physician. With respect to treating physicians, an ALJ must complete a sequential two-step process for evaluating a medical opinion. *See Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Id.* A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374180, at *2 (July 2, 1996)). If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process. *Id.* In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. §§ 404.1527(c), 416.927(c).

The ALJ stated that he gave Dr. Franklin's opinion "little weight" because "he failed to specify a time duration relating to [Griego's] inability to work and did not provide any function by function analysis." (AR 20.) The ALJ did not, however, conduct a treating physician analysis or explain why Dr. Franklin's opinion should not be accorded controlling weight under *Krauser*. This too constitutes reversible error.

At phase two of step four, Griego argues that the ALJ erred by not making findings as to the mental and physical demands of Griego's past relevant work. After the ALJ has made an RFC finding, the next phase of step four of the sequential evaluation process is to "make findings regarding the physical and mental demands of the claimant's past work." *Winfrey*, 92 F.3d at

1024 (citation omitted). "To make the necessary findings, the ALJ must obtain adequate 'factual information about those work demands which have a bearing on the medically established limitations.'" *Id.* (quoting SSR 82-62, 1982 WL 31386, at *3 (Jan. 1, 1982)). This information may come from the claimant, an employer, or another informed source. SSR 82-62, 1982 WL 31386, at *3. The ALJ made no such findings at step four, and this too constitutes reversible error.

Because I find that the ALJ committed several legal errors at step four, I do not address whether the ALJ's decision is supported by substantial evidence.

## CONCLUSION

I find that the ALJ did not commit reversible error by finding that Griego suffered from non-severe mental impairments at step two. I find that the ALJ erred step four by failing to consider all of Griego's medically determinable impairments when conducting the RFC assessment, by not conducting a treating physician analysis for Dr. Franklin's opinion, and by not making findings about the mental and physical demands of Griego's past relevant work. On remand, the ALJ will address all of Griego's medically determinable impairments when conducting his RFC assessment, conduct a treating physician analysis of Dr. Franklin's opinion and explain why that opinion is or is not accorded controlling weight, and make findings as to the mental and physical demands of Griego's past work as a dental receptionist. The motion is GRANTED, and the case is remanded to the SSA for further proceedings.

IT IS SO ORDERED.

William P. Lynch
United States Magistrate Judge

A true copy of this order was served on the date of entry--via mail or electronic means--to counsel of record and any pro se party as they are shown on the Court's docket.